# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

|                                              |     |                              |
| -------------------------------------------- | --- | ---------------------------- |
| JEAN MARIE COMPARETTO,                        | §   |                              |
|                                              | §   |                              |
| *Plaintiff,*                                  | §   |                              |
|                                              | §   |                              |
| *versus*                                      | §   | CIVIL ACTION NO. 3:11-1514   |
|                                              | §   |                              |
| CAROLYN W. COLVIN,                            | §   |                              |
| Acting Commissioner of                        | §   |                              |
| Social Security,[1]                           | §   |                              |
|                                              | §   |                              |
| *Defendant.*                                  | §   |                              |

## REPORT AND RECOMMENDATION

Jean Marie Comparetto ("Comparetto") brings this action under 42 U.S.C. § 405(g), seeking review of an adverse decision on her application for disability-based benefits under the Social Security Act. Complying with General Order # 18 (Dkt. No. 3), the parties join issues through competing briefs.[2]

## I. Background

In August 2007, Comparetto protectively filed for disability insurance ("DIB") benefits claiming that she became disabled as of August 30, 2006, due

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she therefore should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C § 405(g).

[2] General Order # 18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

to *chronic back pain* and *neck pain*.  (T. 94, 175-184, 194).[3] On March 6, 2009, a video evidentiary hearing was held before administrative law judge Dennis O'Leary ("ALJ O'Leary"), who denied Comparetto's application.  (T. 37-62, 92-108).[4]

Comparetto appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals, which granted Comparetto's request to review.  (T. 109-113).  In its remand Order dated October 21, 2009, the Appeals Council directed that further consideration be given to Comparetto's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations as well as evaluate the treating and non-treating source opinion pursuant to the provisions of 20 C.F.R. § 404.1527 and Social Security Ruling 96-2p and 96-5p, and explain the weight given to such opinion evidence. (T. 112-113).  The Appeals Council also instructed that the ALJ may request that the treating and non-treating sources provide additional evidence and/or further clarification of the opinions and medical source statements about what Comparetto can still do despite her impairments.  *Id.*  Finally, the Appeals Council directed the ALJ to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base if warranted by the expanded record.  *Id.*

---

[3]     "T." followed by a number refers to the page of the administrative record.  (Dkt. No. 6).

[4]     ALJ O'Leary presided over the hearing from Newark, New Jersey. Comparetto appeared and testified through interactive video in Binghamton, New York.  She was represented at the hearing by Carlos Padrol, a paralegal in the office of attorney James Troy.  (T. 39, 92).

Thereafter, Comparetto appeared at a video evidentiary hearing held on April 15, 2010, before ALJ Thomas P. Tielens ("ALJ Tielens").[5] (T. 19-30, 63-87). At the hearing, ALJ Tielens noted that the case was sent back by the Appeals Council for further inquiry into the assessment by the consultative examiner and Comparetto's treating physician. (T. 66). Additionally, ALJ Tielens observed that significantly more records were in the file. *Id.* Comparetto's counsel lodged an objection to the December 2007 report (T. 358-363) completed by the State Agency medical consultant, Dr. S. Putcha, arguing that he was not an acceptable medical source, and that his decision should be given little to no weight. (T. 66). ALJ Tielens noted the objection, received the exhibits in to evidence, and heard testimony from Comparetto. (T. 66-87). On June 18, 2010, ALJ Tielens denied Comparetto's claim. (T. 19-30).

Comparetto appealed ALJ Tielens's decision to the Appeals Council for review (T. 13-15), but requested that the review be limited to the period from August 30, 2006, to August 30, 2010.[6] (T. 8). Comparetto submitted and the Appeals Council received additional evidence, including numerous medical records and a brief from Comparetto's counsel advocating for review (T. 4-5, 562-657). The Appeals Council denied Comparetto's request to review on October 26, 2011. (T. 1-5). This rendered ALJ Tielens's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Comparetto timely instituted this case on December 23, 2011. (Dkt. No. 1).

---

[5]     ALJ Tielens presided over the hearing from Syracuse, New York. Comparetto appeared and testified through interactive video in Binghamton, New York. (T. 19, 65). Comparetto was represented by new counsel, Laura Pierce, an attorney associated with the law firm of Binder & Binder. *Id.*

[6]     On November 29, 2010, Comparetto filed a subsequent claim for disability insurance benefits and supplemental security income. (T. 8). On February 11, 2011, she was found disabled as of September 1, 2010. *Id.*

## II. Commissioner's Decision

ALJ Tielens determined that Comparetto satisfies the insurance requirements of the DIB program. (T. 22). Turning to the disability issue, ALJ Tielens concluded at Step 1 that Comparetto has not engaged in substantial gainful employment since August 30, 2006. *Id.* At Step 2, he found that Comparetto has severe impairments consisting of lumbar spine impairment and alcohol dependence disorder.[7] *Id.* At Step 3, he determined that neither of these severe impairments meets or medically equals any of the listed impairments that are presumptively disabling. (T. 23-25).

ALJ Tielens next assessed Comparetto's RFC assessment as the capacity to perform a full range of light work.[8] (T. 25-29). Then, at Step 4, ALJ Tielens compared Comparetto's RFC for light work with demands of her past work as a waitress and a factory worker in a plastic manufacturing plant and determined her past relevant work exceeded her RFC. (T. 29). At Step 5, utilizing the Medical-Vocational Guidelines, ALJ Tielens concluded that Comparetto "has not been under a disability" and her claim was denied.[9] (T. 29-30).

The pivotal finding for purposes of this appeal is ALJ Tielens's RFC finding that Comparetto retains capacity to perform a *full range* of light work.

---

[7]    ALJ Tielens also found that Comparetto's neck pain, headaches, right ear cullulitis, heart murmur, adjustment disorder did not have any greater that a slight or minimal effect on her ability to perform basic work activities, and thus, were not severe. (T. 22-23).

[8]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). In addition, "the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday." SSR 83-10, 1983 WL 31251, at *5-6 (1983).

[9]    ALJ Tielens's complete findings and conclusions appear on nine pages, T. 22-30, of the administrative transcript contained in the record before the court. (Dkt. No. 6).

As described in the next section, Comparetto asserts that ALJ Tielens committed several errors in arriving at that determination.

## III.  Points of Error

Comparetto proffers several alleged errors:

1.  The ALJ erred by failing to properly evaluate the medical evidence, including: failing to follow the treating physician rule; improperly determining that Plaintiff's neck impairments and mental impairments were not severe impairments at Step 2 of the evaluation; and improperly evaluating Plaintiff's residual functional capacity; and

2.  The ALJ erred by relying solely upon the Medical-Vocational Guidelines.

(Dkt. No. 8, pp. 13-25).

Comparetto argues, first, that ALJ Tielens engaged in impermissible circumstantial critique of her treating neurologist, Dr. Burk Jubelt, M.D., primary care physician, Dr. James Wheeling, M.D., pain management specialist Dr. Eric Tallarico, M.D., and nurse practitioner Karen Cleveland's opinions regarding her limitations and that their opinions should have been given more weight than that of the non-examining State Agency medical consultant, Dr. S. Putcha and the disability analyst. (Dkt. No. 8, pp. 13-17). Next, Comparetto maintains that her cervical impairments and depression more than satisfied the *de minimis* threshold of severity at Step 2 and that ALJ Tielens cherry-picked the evidence to support his decision. *Id.*, pp. 17-20. Third, Comparetto maintains that ALJ Tielens's RFC that she can perform the full range of light work is not supported by a single medical opinion from a treating or examining doctor. *Id.*, pp. 20-23. According to Comparetto, substantial evidence proves a less than sedentary RFC and the only evidence that ALJ pointed to in support of his RFC was the review of the non-examining, State Agency medical consultant Dr. Putcha and the disability analyst. *Id.* Last, Comparetto asserts

that ALJ Tielens's reliance solely on the Medical-Vocational Guidelines ("the grids") to find her not disabled was improper because her impairments cause numerous non-exertional limitations. *Id.*, pp. 23-25. Comparetto maintains that the failure to consult a vocational expert regarding the erosion of her residual occupational base by her nonexertional limitations mandates reversal. *Id.*

The Commissioner responds that substantial evidence supports ALJ Tielens's decision denying benefits. (Dkt. No. 10, pp. 5-21). The Commissioner asserts that ALJ Tielens properly determined Comparetto's severe impairments at Step 2. *Id.*, pp. 5-12. The Commissioner also contends that ALJ Tielens properly assessed the opinion evidence from treating, examining, and non-examining physicians and that ALJ Tielens's RFC assessment is supported by substantial evidence. *Id.*, pp. 12-19. Finally, the Commissioner maintains that ALJ Tielens properly relied on the Medical-Vocational Guidelines. *Id.*, pp. 19-21. The Commissioner argues that ALJ Tielens correctly concluded that a vocational expert was not required because Comparetto retained the RFC for the full range of light work.

## IV. Preliminary Discussion

The purpose of this preliminary discussion is to delineate governing principles of the Social Security program at issue, the administrative decision-making process (including certain terms of art) and the nature of judicial review, which will aid comprehension of Comparetto's underlying claim, ALJ Tielens's decision, Comparetto's challenges and the ensuing analysis.

*A.    Eligibility for Benefits*

The Disability Insurance Benefits ("DIB") program provides income to *insured* individuals forced into involuntary, premature retirement by reason of *disability*.    Applicants seeking benefits under this statutory provision must prove *"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See* 42 U.S.C. §§ 423(d)(1)(A)*,* 1382c(a)(3).

While straightforward in concept, this eligibility standard is  difficult to meet.    Proof of a serious disease or impairment alone does not establish disability within the meaning of the Social Security Act.    "[I]nstead, it is the impact of the disease, and, in particular, any *limitations it may impose upon the claimant's ability to perform basic work functions*, that is pivotal to the disability inquiry." *Pavia v. Astrue*, No. 5:10–CV–818 (GTS/DEP), 2012 WL 4449859, at *8 (N.D.N.Y. Aug. 20, 2012) (citing *Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir. 1980)) (italics added); *see also Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983); *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983).    This means that a showing of generalized disability is insufficient.    Rather, a claimant must also prove inability to engage in *any* form of substantial gainful employment.    Thus, a person who might well be considered to be disabled in the ordinary sense of the word, may not be disabled within the specialized meaning of the Social Security Act.

This standard is so rigorous that one federal court of appeals has described it as "bordering on the unrealistic."[10]

---

[10]    *See Oldham v. Schweiker,* 660 F.2d 1078, 1083 (5th Cir. 1981).

## B.    Sequential Evaluation Procedure

The law requires *individualized* determinations.  *See Heckler v. Campbell*, 461 U.S. 458, 467 (1983).  Hence, Commissioner Colvin generally must make both medical and vocational assessments in every case.

To accomplish this, the Commissioner utilizes a five-step evaluation procedure for adjudicating disability claims.  *See* 20 C.F.R. § 404.1520(a).[11]  This model is "sequential" in that when a decision can be made at an early step, remaining steps are not considered.  *See id*. It has judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act.  *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler*, 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

---

[11]    In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920)).

*Claimants* must present evidence sufficient to produce favorable findings under the first four steps. *DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998). When they successfully carry this burden, a *prima facie* case of disability is established. *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). The burden then shifts to the *Commissioner* to show in Step 5 that "there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico*, 134 F.3d at 1180; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); 20 C.F.R. § 404.1566.

Specialized rules – some imposed externally by courts – govern the Commissioner's applications of these five steps. Those particularly pertinent to Comparetto's case are described in the remainder of this section.

### 1.   Step 2 Severity Determination

In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.'" *Meadors v. Astrue*, 370 Fed. App'x 179, 182 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); *see also* 20 C.F.R. § 404.1521(a)-(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . .'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen*, 482 U.S. at 154 n. 12).

When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).[12] Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

Some courts suggest that when an ALJ identifies some severe impairments at Step 2 and proceeds through the sequential evaluation procedure on the basis of the combined effects of severe and non-severe impairments, an error in failing to identify all severe impairments at Step 2 is

---

[12]     "[A]pplication of the special technique [must] be documented." *Petrie v. Astrue*, 412 Fed. App'x 401, 408 (2d Cir. 2011)(citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ("PRTF")." *Id*. "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... "include a specific finding as to the degree of limitation in each of the [four] functional areas."'" *Id*.(quoting 20 C.F.R. § 404.1520a(e)(2)).

harmless. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 (2d Cir. 2010) (noting, in *dicta*, that there was no error by ALJ in finding disc herniation non-severe because ALJ did identify other severe claims at Step 2 so that claim proceeded though the sequential evaluation process and all impairments were considered in combination); *see also McCartney v. Commissioner of Soc. Sec.*, Civil Action No. 07–1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments."); *Portorreal v. Astrue*, No. C.A. 07–296ML, 2008 WL 4681636, at *3 (D.R.I. Oct. 21, 2008).

2.   <u>Treating Source Opinions</u>

The treating physician rule requires ALJs to give controlling weight to opinions of claimants' treating physicians regarding the nature and severity of impairments, provided they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Sanders v. Commissioner of Soc. Sec.*, No. 11-2630-cv, 2012 WL 6684569, at *2 (2d Cir. Dec. 26, 2012); *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

When controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), an ALJ must consider the following factors in determining how much weight, if any, to give such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the

treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134.

Treating physician opinion may be rejected based upon proper consideration of any of these factors. Although these factors must be substantively applied; failure to expressly recite them in a written decision does not necessarily result in a remand. *See Halloran*, 362 F.3d at 32. Nonetheless, ALJs must "always give good reasons" for the weight they assign to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2). Failure to do so is ground for remand. *Sanders*, 2012 WL 6684569, at * 2; *Halloran*, 362 F.3d at 33 ("[the court does] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion."); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

3.  Residual Functional Capacity

At Step 4, an ALJ first assesses and articulates a claimant's "residual functional capacity" ("RFC"). This bureaucratic term refers to what claimants can still do in a work setting despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545; *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 404.1545(a). "A 'regular

and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Melville*, 198 F.3d at 52 (quoting SSR 96–8p, 1996 WL 374184, at *2).

The Commissioner provides detailed guidance for determining RFC in the form of a formal regulation and also an internal policy ruling. Collectively, these directives (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that an ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b); SSR 96-8p, 1996 WL 374184, at **5, 7.

4. <u>Medical-Vocational Guidelines ("the Grids")</u>

At Step 5 of the sequential disability analysis, an ALJ determines whether claimants, despite their impairments, can still do work existing in the national economy. At this stage, the burden rests with the Commissioner.

Generally, an ALJ elicits or consults expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In limited circumstances, however, the Commissioner may take *administrative notice* of disability *vel non* by adopting and applying findings published in "*Medical-Vocational Guidelines*," commonly called *"the grids." See Roma v. Astrue*, 468 Fed. App'x 16, 20-21 (2d Cir. 2012); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)*; see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only

*exertional* impairments[13] are in play, and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir. 2009); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the Grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.[14]

A grid rule does not apply directly when the RFC findings do not coincide with all the grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. Because the grids do not take into account limiting or disabling effects of *nonexertional* impairments,[15] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits

---

[13]    "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet . . . strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus-Fry v. Astrue*, No. 7:11-CV-883 (MAD), 2012 WL 3779132, at *15 n. 14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel*, No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n. 12 (S.D.N.Y. Mar. 31, 1998)).

[14]    The grids are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1567(a)).

[15]    "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect[ing] only your ability to meet . . . demands of jobs other than . . . strength demands . . . ." *See* 20 C.F.R. § 404.1569a(c)(1). Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96-9p, Determining Capability To Do Other Work, Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by . . . nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2).[16]

Similarly, the grids do not factor limitations that preclude an individual from performing a *full range* of work at given exertional levels. In such instances, the Commissioner provides additional guidance through a Ruling that directs administrative judges to engage in an erosion-of-occupational-base analysis when a claimant's limitations prevent performance of a full range of even the least strenuous category of sedentary work. SSR 96–9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed. Reg. 34478 (July 2, 1996).[17]

---

[16]    Social Security Ruling 85-15 ("SSR 85-15") addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85-15, THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *3 (SSA 1985). The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments.

[17]    When such limitations only *slightly* erode the sedentary occupational base, the grids may still be applied directly. SSR 96-9p, 61 Fed. Reg. at 34481. But, when limitations *significantly* erode the sedentary occupational base, it is appropriate to consult an extrinsic vocational resource to determine whether jobs exist in significant numbers that an individual may still be able to perform even with an eroded sedentary occupational base. *Id.* at 34483. In addition, when there is more than a slight impact on an individual's ability to perform a full range of sedentary work, but the administrative judge decides that the individual remains able to do other work, the administrative judge must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country. *Id.* at 34481.

*C.    Judicial Review of Commissioner's Decision*

Judicial review of the Commissioner's denial of Social Security benefits is limited.    The court's abbreviated role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562. F.3d 503, 507 (2d Cir. 2009), *cert. denied*, ___U.S.___, 130 S. Ct. 1503 (2010); *Berry*, 675 F.2d at 467; *see also* 42 U.S.C. § 405(g).  When proper principles of law were applied, and the Commissioner's decision is supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran*, 362 F.3d at 31.

Under these constraints, reviewing courts cannot retry factual issues *de novo,* nor can they substitute their interpretations of administrative records for that of the Commissioner when the record contains substantial support for the ALJ's decision.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  Rather, in such circumstances, courts must defer to the Commissioner's resolution of conflicting evidence.  *See Behling v. Commissioner of Soc. Sec.*, 369 Fed. App'x 292, 293 (2d Cir. 2010) (citing *Clark v. Commissioner*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record.")).[18]  Hence, reviewing courts may not overturn the Commissioner's administrative decisions simply because they would have

---

[18]      *See also Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). "'[The Court] may only set aside a determination which is based upon legal error or not supported by substantial evidence.'"  *Monette v. Astrue*, 269 Fed. App' 109, 110-11 (2d Cir. 2008)(quoting *Berry*, 675 F.2d at 467); *see also* 42 U.S.C. § 405(g).

reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012).

"Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson*, 402 U.S. at 401; *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran*, 362 F.3d at 31. Stated another way, to be "substantial" evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991).

When conducting a substantial evidence review, a court's responsibility is "'to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act . . . is remedial in purpose.'" *Monette v. Astrue*, 269 Fed App'x 109, 110 (2d Cir. 2008) (quoting *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 798-99 (2d Cir. 1983)). In this circuit, courts consider both objective and subjective factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) claimant's age, educational background, and work history. *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983).

# V.   Analysis

Central to Comparetto's claims is whether ALJ Tielens followed the treating physician rule. Because this determination permeates throughout her claims, it will be addressed first and its impact on the various steps of the sequential evaluation process.

*A.   The Treating Physician Rule and Evaluation of Medical Evidence*

1.   <u>RFC Determination</u>

Comparetto challenges ALJ Tielens's RFC determination (T. 25) that she could perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). (Dkt. No. 8, pp. 17-20, 20-23). Comparetto contends that ALJ Tielens failed to give appropriate weight to the opinions of her treating physicians, who reported she had less than a sedentary RFC. *Id*. Comparetto further contends that ALJ Tielens's RFC determination is unsupported by substantial evidence. *Id*.

As set forth in Section IV.*B*.3, *supra*, residual functional capacity is defined as "what an individual can still do despite his or her limitations." *Melville*, 198 F.3d at 52. ALJ Tielens's written decision cites both the governing regulation and ruling, thus disclosing his awareness of them (T. 21, 25) as well as the Appeals Council's directive that further consideration be given to Comparetto's maximum RFC during the entire period at issue, that rationale be provided with specific references to evidence of record in support of assessed limitations, and that the treating and non-treating source opinion be evaluated pursuant to the regulation and rulings. (T. 19).

Despite his awareness, ALJ Tielens did not follow the treating physician rule in assessing Comparetto's exertional capabilities. There is not a single medical opinion from a treating or examining doctor to justify ALJ Tielens's

assessment. Rather, all of the medical evidence demonstrates less than a sedentary RFC. For example, Comparetto's treating neurologist opined that she "is disabled from doing any physical type of work where she is on her feet for long periods of time or is required to [carry] heavy objects weighing more than 5 pounds." (T. 374). Her primary care physician, Dr. Wheeling, who is board certified in internal medicine with a sub-specialty in cardiology, concurred, opining: "[s]he is unable to engage in [any] prolonged sitting or standing without exacerbating pain." (T. 375). Pain management specialist, Dr. Tallarico, reported that Comparetto can only stand/walk for zero to one hours in an eight-hour workday. (T. 546). He noted that she cannot sit or stand/walk continuously in a work setting and would require unscheduled 15 minute breaks every hour or two. (T. 549). Dr. Tallarico further opined that Comparetto can only occasionally lift or carry up to ten pounds. (T. 547). Even consulting examiner, Dr. Magurno reported that she has a "marked limitation of carrying and lifting," and is moderately limited in her ability to reach, especially overhead. (T. 352). Dr. Magurno also noted that "[s]he would need to be allowed accommodations to change positions to alleviate back and neck pain . . . ." *Id.*

ALJ Tielens did not to provide good reasons for failing to give controlling weight to Comparetto's treating physicians' opinions.[19] Instead, he appeared to have scoured the record for isolated treatment records that tend to support his conclusion (T. 23, 334) while completely ignoring the numerous reports to the

---

[19]      The Second Circuit "has consistently held the failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders*, 2012 WL 6684569, at * 2; *Schaal*, 134 F.3d at 505; *Halloran*, 362 F.3d at 33.

contrary. (T. 319-20, 338, 340-41, 342-43, 346-48, 376-77, 381, 490-92, 509, 543, 544-45, 548, 622).[20]

Additionally, taking a more adversarial approach, ALJ Tielens also ferrets out obscure pieces of hearsay in an attempt to discredit Comparetto and her alleged limitations. (T. 27, 376).[21] Further, ALJ Tielens, while dismissing the opinion of Dr. Wheeling, Comparetto's long-time treating primary care physician, that she "is unable to engage in prolonged sitting or standing without exacerbating back and lower extremity pain and weakness" because Dr. Wheeling is board certified in cardiology, he fails to recognize that Dr. Wheeling also is board certified in internal medicine. (T. 28).[22] Moreover, with respect to Comparetto's treating neurologist, Dr. Jubelt, ALJ Tielens dismisses his opinion that she could not lift more than five pounds or be on her feet for long periods on circumstantial critiques of Dr. Jubelt's own treatment records. (T. 28).[23] As the

---

[20] In this example, ALJ Tielens focused on one treatment note that indicated Comparetto's neck problem was "not too bad at the present time," but ignored numerous medical record which documented severe neck pain radiating down her arms, causing tingling and numbness in her hands. (T. 23).

[21] ALJ Tielens refers to an opinion of Dr. Shonfeldt in which he allegedly notes that Comparetto "was very animated, active, bending, reaching, and not very impaired." (T. 27). The record, however, does not contain a single record from this physician. (T. 1-657). The only mention of this doctor is a single, passing reference by Dr. Wheeling. (T. 376). The procedure before the Social Security Administration is not supposed to be adversarial, but, rather, inquisitorial. *See Castano v Astrue*, 650 F. Supp.2d 270, 280 (E.D.N.Y. 2009) (citing *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009)).

[22] Dr. Wheeling also is board certified in internal medicine. (Dkt. No. 8, p. 16).

[23] In reducing Dr. Jubelt's opinion to "little weight," ALJ Tielens maintains that Dr. Jubelt's opinion was "not supported by his relatively mild clinical findings upon examination of the claimant." (T. 28). Contrary to ALJ Tielens's assertion, Dr. Jubelt's records reveal they are consistent and support his conclusion regarding Comparetto's limitations. Dr. Jubelt's clinical findings were anything but mild. For example, he found positive straight leg raising during several examinations. (T. 334, 338, 374). He also found abnormal neurological findings, including paraspinal muscle tenderness. (T. 334, 338, 374), radiating numbness (T. 336, 374), and moderately to significantly decreased pinprick and vibration in her upper and lower extremities bilaterally. (T. 338, 340, 347-48).

courts have admonished, the procedure before the Social Security Administration "[i]s not a game of 'gotcha.' The goal is not for the Commissioner to 'win' a finding of nondisability, but to fairly determine if a claimant is disabled." *Castano v. Astrue*, 650 F. Supp.2d 270, 280 (E.D.N.Y. 2009) (citing *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005)).

In sharp contrast to the numerous opinions of treating and examining physicians that Comparetto's RFC was less than sedentary, the only evidence ALJ Tielens references in support of his RFC assessment was the review of the non-examining, State Agency medical consultant, Dr. Putcha. (T. 28-29). In fact, ALJ Tielens acknowledged that there was no treating medical opinions to support his RFC and that the regulations require him to support his assessment with substantial evidence. "As pointed out by the claimant's prior representative, *there is no medical opinion from a treating source that the claimant has the capacity to do light work*." (T. 29) (emphasis added). Additionally, ALJ Tielens admitted that the disability analyst's opinion was not a medical source.[24] (T. 29). Notwithstanding, over the objection of Comparetto (T. 66), ALJ Tielens still gave some weight to both the disability analyst and Dr. Putcha. (T. 29). The contradictory RFC provided by the State Agency disability analyst, Dr. Putcha, is not a good reason to disregard Comparetto's treating physicians's opinions. *Sanders*, 2012 WL 6684569, at *3 n. 4 (internal citation omitted). Where there are conflicting opinions between the treating and

---

[24] "[A]gency policy requires ALJs . . . to evaluate SDM [*i.e.*, Single Decision-Maker] RFC assessments as adjudicatory documents only, and not accord them any evidentiary weight when deciding cases at the hearing level." (*See* Dkt. No. 8, at Exhibit B (Frank A. Cristaudo, SSA Chief ALJ, *Memorandum: Evaluation of Single Decisionmaker Residual Functional Capacity Assessments* (May 19, 2010)).

consulting sources, the consulting physician's opinions should be given limited weight." *Id*.

In light of the uncontradicted medical evidence demonstrating a less than sedentary RFC, ALJ Tielens's failure to provide good reasons for controlling weight to Comparetto's treating physicians' opinions, and ALJ Tielens's failure to provide any acceptable medical evidence to support his RFC assessment, ALJ Tielens's determination that Comparetto is capable of performing the full range of light work is not supported by substantial evidence.

2.    Non-Severity Findings

Comparetto claims that ALJ Tielens erred when he found her cervical and mental impairments have no more "than a slight or minimal effect" on her ability to perform basic work activities. (Dkt. No. 8, pp. 17-20). Comparetto argues ALJ Tielens cherry-picked through the record to discuss only those opinions that supported his own conclusions. (Dkt. No. 8, p. 18).

As a threshold matter, an ALJ's omission of an explicit finding regarding a Step 2 impairment does not necessarily require remand when the omitted impairment was accurately accounted for in the ALJ's RFC determination. *See Stanton*, 370 Fed. App'x at 233. Here, however, ALJ Tielens failed to incorporate in his RFC any limitations related to Comparetto's cervical impairment.[25] (T. 25-

---

[25]    The evidence of record related to Comparetto's alleged adjustment disorder does not indicate that it had any greater than a slight or minimal effect on her ability to perform basic work activities. Comparetto was diagnosed with adjustment disorder in 2008, due to symptoms stemming from the death of her mother and separation from her husband. (T. 400-401). In February 2009, she resumed mental health treatment due to bereavement issues relating to the loss of several additional family members and a pet dog. (T. 398). Comparetto testified during the administrative hearing that the therapy she received was mostly for grief counseling because she had lost several close family members. (T. 85-86). Finally, Comparetto reported to her psychiatrist, Dr. Damon Tothz, M.D., and social workers that she was functioning well on a daily basis and had

(continued...)

29).  Given ALJ Tielens' failure to properly weigh the medical opinion evidence as set forth, *supra*, coupled with the wealth of evidence in the record that details such an impairment,[26] this error cannot be rendered harmless.

## B.  *Nonexertional Impairments and the Grids*

Comparetto argues that ALJ Tielens erred by relying solely on the Medical–Vocational Guidelines and failing to consult a vocational expert because Comparetto's impairments cause nonexertional limitations.  (Dkt. No. 8, pp. 23-25).  The Commissioner responds that the Appeals Council did not mandate evidence from a vocational expert, but directed it only if warranted by the

---

[25](...continued)
no acute concerns.  (T. 447, 450, 458, 477, 485).  In fact, Dr. Tothz noted in September 2009 that her mental status examination had not changed significantly over the course of their sessions, but, he opined Comparetto had a problem with substances which needed to be addressed regularly.  (T. 458).  To the extent Comparetto relies upon August 2010 reports from social worker Yahna Solowiej, LMSW (T. 629-641) as indicative of the severity of her adjustment disorder, these reports fail to do so, as Solowiej's opinions were made in relation to Comparetto's treatment at a half-way house for substance abuse, were submitted first to the Appeals Council and not ALJ Tielens, and were found by the Appeals Council not to provide a basis for changing ALJ Tielens's decision. (T. 1-5).

[26]       Numerous medical records detail severe neck pain that radiates down her arms, causing tingling and numbness in her hands.  (T. 319-20, 338, 340-41, 342-43, 346-48, 376-77, 381, 490-92, 509, 543, 544-45, 548, 622).  In September 2006, magnetic resonance imaging of her cervical spine revealed herniations at C5-C6 and C6-C7 with spinal neural foraminal stenosis.  (T. 319, 340).  Her treating physician, Dr. Jubelt, found decreased sensory and vibration in her upper extremities.  (T. 340, 342-343, 347).  In October 2007, consultative examiner Dr. Magurno found "decreased discrimination to pin/dull in the C7 distribution [of upper extremities] bilaterally."  (T. 351).  Dr. Magurno also found that Comparetto's shoulder abduction "is limited to 120 degrees bilaterally (as it produced neck pain)."  Id.  In May 2009, nurse practitioner Lynne Marie Miller ("Miller") noted that Comparetto was experiencing numbness in her left hand and pain in her left shoulder which goes down her shoulder and arm when she hyperextends her neck.  (T. 491).  Miller further noted that Comparetto's hand grip was weakened and she had limited external and internal rotation.  (T. 491).  Similarly, in November 2009, nurse practitioner Karen Cleveland ("Cleveland") reported Comparetto had neck pain that radiates into her arms.  She further noted that Comparetto has numbness and tingling in  her arms and hands.  (T. 453).  In February 2010, pain management specialist, Dr. Tallarico, opined that Comparetto continued to suffer from neck pain with radiation into the arms, and that she was unable to keep her neck in a constant position on a sustained basis.  (T. 545, 548).

expanded record. (Dkt. No. 10, p. 19-20). According to the Commissioner, because the ALJ found that Comparetto retained the RFC for the full range of light work, it was not required to consult a vocational expert. *Id*.

When a nonexertional impairment significantly diminishes a claimant's ability to work, *i.e*, so that a claimant is unable to perform the full range of a work category, the grids, alone, do not accurately determine disability status because they fail to take into account nonexertional impairments.[27] Thus, an ALJ must introduce other evidence that jobs exist in the national economy that the nonexertionally-impaired claimant can perform. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp*, 802 F.2d at 603; *see also Heckler*, 461 U.S. at 462 n. 5 ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered."); *Butts*, 388 F.3d at 383–84 (if the grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must introduce testimony to prove "that jobs exist in the economy which the claimant can obtain and perform"); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e).

In this case, Comparetto's treating doctors consistently reported severe functional limitations in her abilities to climb, balance, reach, handle, and finger objects. Dr. Jubelt noted sensory and vibration loss in her upper and lower extremities bilaterally. (T. 334, 336, 338, 340, 343, 347, 374). Additionally, Dr. Wheeling opined that Comparetto is unable to engage in prolonged sitting or standing without exacerbating pain. (T. 375). Likewise, Dr. Tallarico determined that Comparetto needed unscheduled 15 minute rests every hour or

---

[27] The phrase "significantly diminish" is defined as "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Bapp*, 802 F.2d 605-06; *accord Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010); *Roma*, 468 Fed. App'x at 21.

two that she could not sit, stand, or walk continuously. (T. 546). He further found that she has significant bilateral limitation in using her arms for reaching, including overhead, and that she cannot keep her head in a static position on a sustained basis. (T. 547-48). Even the consultative examiner, Dr. Magurno, noted "decreased discrimination to pin/light/dull" in Comparetto's upper and lower extremities. (T. 351). He also found moderate limitations for walking, lifting, reach "especially overhead." (T. 352). Significantly, Dr. Magurno noted "she would need to be allowed accommodations to change positions frequently to alleviate back and neck pain, as she had to do this in the office during examination." (T. 352). Nurse practitioner Cleveland observed that Comparetto's fine motor skills are impaired, leaving her unable to work with her hands. (T. 565).

As set forth, *supra*, ALJ Tielens erroneously gave these opinions little weight and, instead, relied upon the State Agency medical consultant's and disability analyst's opinion that Comparetto retained the capacity to perform light work. (T. 27-29). In summary fashion, ALJ Tielens concluded that the disability analyst's opinion was "well supported by the objective medical evidence and the broad range of activities of daily living" and although not a medical source opinion, ALJ Tielens gave it "some weight" in determining Comparetto's RFC. This is insufficient. When faced with evidence of significant nonexertional impairments, as here, ALJ Tielens was required to adduce vocational expert testimony regarding the erosion of Comparetto's residual occupational base.[28] ALJ Tielens failed to do so. Consequently, his decision,

---

[28] The Appeals Council remand order directed that "[i]f warranted by the expanded record, [the ALJ shall] obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). (T. 113).

which relies solely on the grids to deny Comparetto's application, lacks substantial evidentiary support.

## VI.  Recommendations

The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including consideration of:  (a) reevaluation of the medical source opinions regarding Comparetto's functional abilities and/or an independent medical examination to determine the same;  (b) reassessment of Comparetto's residual functional capacity in accordance with her functional abilities; (c) description of the extent to which Comparetto's occupational base is eroded by nonexertional impairments, if any; and (d) if desirable or necessary, testimony of either a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with Comparetto's limitations.

## VII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir.

1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___1___ day of _____March_____ 2013.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge